1

David P. Enzminger (SBN: 137065)
denzminger@winston.com

2

Michael A. Tomasulo (SBN: 179389)
mtomasulo@winston.com

3

WINSTON & STRAWN LLP
333 South Grand Avenue, 38th Floor

4

Los Angeles, CA 90071-1543
Telephone:    (213) 615-1700

5

Facsimile:    (213) 615-1750

6

Louis L. Campbell (SBN: 221282)
llcampbell@winston.com

7

Matthew R. McCullough (SBN: 301330)
mrmccullough@winston.com

8

WINSTON & STRAWN LLP
275 Middlefield Road, Suite 205

9

Menlo Park, California 94025-4004
Telephone:    (650) 858-6500

10

Facsimile:    (650) 858-6550

11

Saranya Raghavan (*pro hac vice*)
sraghavan@winston.com

12

WINSTON & STRAWN LLP
35 W. Wacker Drive

13

Chicago, IL 60601
Telephone:    (312) 558-5600

14

Facsimile:    (312) 558-5700

15

Attorneys for Plaintiff and Counter-Defendant
Epic Games, Inc.

16

17

**UNITED STATES DISTRICT COURT**

18

**NORTHERN DISTRICT OF CALIFORNIA**

19

EPIC GAMES, INC., a Maryland Corporation,

20

Plaintiff,

21

v.

22

ACCELERATION BAY LLC, a Delaware
Limited Liability Corporation,

23

24

Defendant.

25

26

27

28

Case No.: 4:19-cv-04133-YGR

**PLAINTIFF AND COUNTERCLAIM-DEFENDANT EPIC'S RESPONSE TO ACCELERATION BAY'S COUNTERCLAIMS**

**JURY TRIAL DEMANDED**

Plaintiff and Counterclaim-Defendant Epic Games, Inc. ("Epic") submits the following response to the counterclaims contained in Defendant and Counterclaim-Plaintiff Acceleration Bay's ("Acceleration Bay") Answer and Counterclaims (D.I. 41).

## GENERAL DENIAL

Unless specifically admitted below, Epic denies each and every allegation in Acceleration Bay's Answer and Counterclaims.

## RESPONSE TO COUNTERCLAIMS

1.      Epic admits that Acceleration Bay is a Delaware limited liability corporation, but the listed address is contrary to the address on Acceleration Bay's website and the letters Epic has received from Acceleration Bay.

2.      Epic admits that it is a Maryland corporation with its principal place of business at 620 Crossroad Blvd., Cary, North Carolina, 27518.

3.      Denied.

4.      Denied.

5.      Epic admits that Fortnite Battle Royale has included "squads" and an "auto-fill" mode. The remaining allegations are denied.

6.      Denied.

7.      Paragraph 7 appears to be a duplicate of paragraph 6 and is denied.

## JURISDICTION AND VENUE

8.      Epic admits that this Court has subject matter jurisdiction.

9.      Epic admits that this Court has personal jurisdiction over Epic because Epic filed the Complaint here. Epic denies the remaining allegations.

10.     Epic admits that venue in this district is proper.

## THE ASSERTED PATENTS

11.     Epic lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 11 and on this basis, denies them.

12.     Epic lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 12 and on this basis, denies them.

13.  Epic lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 13 and on this basis, denies them.

14.  Epic lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 14 and on this basis, denies them.

15.  Epic lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 15 and on this basis, denies them.

16.  Epic lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 16 and on this basis, denies them.

## COUNT I

17.  Epic hereby incorporates by reference the responses of the preceding paragraphs.

18.  Denied.

19.  Denied.

20.  Denied.

21.  Denied.

22.  Denied.

## COUNT II

23.  Epic hereby incorporates by reference the responses of the preceding paragraphs.

24.  Denied.

25.  Denied.

26.  Denied.

27.  Denied.

28.  Denied.

## COUNT III

29.  Epic hereby incorporates by reference the responses of the preceding paragraphs.

30.  Denied.

31.  Denied.

32.  Denied.

33.  Denied.

1    34.    Denied.

2    35.    Denied.

3    36.    Denied.

4    37.    Denied.

5                                      **COUNT IV**

6    38.    Epic hereby incorporates by reference the responses of the preceding paragraphs.

7    39.    Denied.

8    40.    Denied.

9    41.    Denied.

10    42.    Denied.

11    43.    Denied.

12                                      **COUNT V**

13    44.    Epic hereby incorporates by reference the responses of the preceding paragraphs.

14    45.    Denied.

15    46.    Denied.

16    47.    Denied.

17    48.    Denied.

18    49.    Denied.

19    50.    Denied.

20    51.    Denied.

21    52.    Denied.

22                                      **COUNT VI**

23    53.    Epic hereby incorporates by reference the responses of the preceding paragraphs.

24    54.    Denied.

25    55.    Denied.

26    56.    Denied.

27    57.    Denied.

28    58.    Denied.

59.   Denied.

60.   Denied.

61.   Denied.

### AS TO ACCELERATION BAY'S PRAYER FOR RELIEF

These paragraphs set forth the statement of relief requested by Acceleration Bay, to which no response is required. To the extent that these paragraphs require a response, Epic denies that Acceleration Bay is entitled to any of the requested relief and denies any allegations contained herein. Epic requests that a take-nothing judgement be entered in its favor and against Acceleration Bay on all of its counterclaims.

### AS TO ACCELERATION BAY'S DEMAND FOR A JURY TRIAL

This section purports to request a trial by jury and does not require a response.

### AFFIRMATIVE DEFENSES

1.    Further answering the Complaint, Epic asserts the following affirmative defenses, undertaking the burden of proof only as to those defenses required by law, regardless of how such defenses are denominated here. Epic reserves the right to rely upon any additional defenses that become available or apparent during discovery, and reserves its right to amend this Response and to assert such additional defenses or, if appropriate, delete additional defenses as discovery proceeds, including the right to assert claims for inequitable conduct. Epic asserts each of these affirmative defenses in the alternative, without admitting that Epic is in any way liable to Acceleration Bay, that Acceleration Bay has been or will be injured or damaged in any way, or that Acceleration Bay is entitled to any relief whatsoever. As a defense to the Counterclaims and each and every allegation contained in it, Epic alleges as follows:

### FIRST AFFIRMATIVE DEFENSE: FAILURE TO STATE A CLAIM FOR RELIEF

2.    The Counterclaims fail to state a claim upon which relief may be granted against Epic, and fails to allege sufficient facts.

### SECOND AFFIRMATIVE DEFENSE: INVALIDITY

3.    The Asserted Patents are invalid and void, at least, for failure to meet one or more of the conditions for patentability set forth in 35 U.S.C. §§ 101 et seq., including but not limited to

failure to comply with the requirements of 35 U.S.C. §§ 101, 102, 103, and 112.

## THIRD AFFIRMATIVE DEFENSE: FAILURE TO PROVIDE

## NOTICE AND/OR FAILURE TO MARK

4.     By reason of Acceleration Bay's failure to meet the requirements of 35 U.S.C. § 287, Acceleration Bay is precluded from seeking damages from Epic for any and all alleged infringement prior to the filing of the Counterclaims. Any claim for damages is limited by the requirements of 35 U.S.C. § 287(a).

## FOURTH AFFIRMATIVE DEFENSE: CLAIM IS NOT

## ENTITLED TO INJUNCTIVE RELIEF

5.     Acceleration Bay's Counterclaims do not assert that it is entitled to injunctive relief.

6.     To the extent Plaintiff asserts that it is entitled to injunctive relief despite the lack of any assertion in its Counterclaims, Plaintiff is not entitled to injunctive relief because any alleged injury to it is not immediate or irreparable, and because Plaintiff has an adequate remedy at law for any claims it can prove.

## FIFTH AFFIRMATIVE DEFENSE: LICENSE

7.     Upon information and belief, the prior owner of the Asserted Patents, Boeing, licensed them to Sony in 2006 pursuant to a Patent License Agreement. Upon information and belief, Section 1.3 of the agreement defines the "Field of Use" for the asserted patents "as technology, applications or services capable of running on or interacting with SONY gaming platform, PlayStation platform or PlayStation OS and the SONY Software Development Kit …." Upon information and belief, Section 2.1 grants Sony Computer Entertainment America Inc. a "nonexclusive, nontransferable license under the [Asserted Patents] within the Field of Use …." Upon information and belief, Section 2.1 also gives Sony the right to grant sublicenses to Sony's "Third Party developers, publishers, Affiliates and end-users of Products which shall be limited to the Field of Use."

8.     Epic is a videogame publisher that publishes games on the Sony gaming platforms and therefore falls within Section 2.1 of the Patent License Agreement with Sony.

9.     Upon information and belief, all of Epic's actions with respect to all games— including the accused *Fortnite* game—that fall within the Sony Field of Use are licensed and

therefore do not infringe the claims of the Asserted Patents.

### SIXTH AFFIRMATIVE DEFENSE: LACK OF STANDING

10.     Upon information and belief, pursuant to the terms of the prior agreement with Sony described above, Sony has had the ability since late 2006 to grant a license to Epic.

11.     Upon information and belief, the ability of Sony to grant a license to Epic deprives Acceleration Bay of standing to assert infringement of the Asserted Patents with respect to any game, like *Fortnite*, designed to operate on the Sony gaming platforms or otherwise in the Sony Field of Use.

### SEVENTH AFFIRMATIVE DEFENSE: INTERVENING RIGHTS

12.     Asserted claim 21 of the '344 patent, claim 19 of the '966 patent, and claim 25 of the '634 patent were all added as substitute claims in IPR proceedings.

13.     The *Inter Partes* Review Certificate cancelling claims 1–11, and 16–19 and substituting claim 21 for cancelled claim 7 of the '344 patent issued on April 11, 2019.

14.     The *Inter Partes* Review Certificate cancelling claims 1–11 and 16–17 and substituting claim 19 for cancelled claim 7 of the '966 patent issued on April 11, 2019.

15.     The *Inter Partes* Review Certificate cancelling claims 1–9 and substituting claim 25 for cancelled claim 5 of the '634 patent issued on April 30, 2019.

16.     The functionality accused of infringing claim 21 of the '344 patent, claim 19 of the '966 patent, and claim 25 of the '634 patent was developed, released, and practiced by Epic prior to April 11, 2019, or at least Epic had made substantial preparation to practice prior to April 11, 2019.

17.     Based on information and belief, Acceleration Bay's claims for relief are limited and/or barred by absolute and equitable intervening rights.

### PRAYER FOR RELIEF ON ACCELERATION BAY'S COUNTERCLAIMS

WHEREFORE, Epic respectfully requests that the Court enter a judgment in its favor and against Acceleration Bay as follows:

A.     An order declaring and entering judgment that Epic has not infringed and does not infringe directly or indirectly, literally or under the doctrine of equivalents, any valid and enforceable claim of the Asserted Patents;

B.      An order declaring and entering judgment that the Asserted Patents are invalid;

C.      An order dismissing with prejudice all of Acceleration Bay's claims against Epic;

D.      An order declaring that Epic is a prevailing party and that this is an exceptional case, awarding Epic its costs, expenses, disbursements, and reasonable attorneys' fees under 35 U.S.C. §§ 284 and 285;

E.      An order compelling Acceleration Bay to pay all costs associated with this action; and

F.      An order granting Epic any such other and further relief as the Court deems just and proper.

## COUNTERCLAIMS

1.      For its Counterclaims against Defendant Acceleration Bay, Plaintiff Epic alleges the following, based upon information and belief. Epic reserves the right to amend its Counterclaims further to add additional counts, including allegations of inequitable conduct, consistent with the facts discovered in this case.

## NATURE OF THE ACTION

2.      This is an action brought pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, for a declaratory judgment that claim 21 of U.S. Patent No. 6,701,344 ("the '344 patent"), claim 19 of U.S. Patent No. 6,714,966 ("the '966 patent"), claim 25 of U.S. Patent No. 6,829,634 ("the '634 patent"), claim 14–17 of U.S. Patent No. 6,910,069 ("the '069 patent"), claim 6–10 of U.S. Patent No. 6,732,147 ("the '147 patent"), and claims 2 and 6 of U.S. Patent No. 6,920,497 ("the '497 patent") (collectively, the "Asserted Patents") are invalid for failing to satisfy the requirements of, without limitation, 35 U.S.C. §§ 101, 102, 103, and/or 112.

## PARTIES, JURISDICTION, AND VENUE

3.      Defendant Acceleration Bay admits that it is a Delaware limited liability corporation and alleges that its principal place of business is 2401 E 3rd Ave, Foster City, California 94404, which is within this district.

4.      Plaintiff Epic is a Maryland corporation with its principal place of business at 620 Crossroads Blvd, Cary, North Carolina, 27518.

5.      This is an action under the Federal Declaratory Judgments Act, 28 U.S.C. §§ 2201

and 2202, against Defendant for a declaration that claim 21 of the '344 patent, claim 19 of the '966 patent, claim 25 of the '634 patent, claim 14–17 of the '069 patents, claim 6–10 of the '147 patent, and claims 2 and 6 of the '497 patent are invalid for failing to satisfy the requirements of, without limitation, 35 U.S.C. §§ 101, 102, 103, and/or 112. Jurisdiction as to these claims is conferred on this Court by 28 U.S.C. §§ 1331 and 1338(a).

6.    This Court has personal jurisdiction over Defendant Acceleration Bay at least because it has availed itself of the jurisdiction of this Court by filing counterclaims of infringement and because of its continuous and systematic contacts with the State of California and with this District. As noted above, Acceleration Bay asserts that its principal place of business is located within this District. Acceleration Bay has also registered to do business in California with the California Secretary of State since March 13, 2015, and keeps a designated agent for service of process in Foster City, California, in this District. Acceleration Bay has established minimum contacts with the forum and the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice.

7.    Venue is proper in this jurisdiction under 28 U.S.C. §§ 1391 and 1400(b), at least because Defendant has consented to venue in this Court by filing its Counterclaims against Plaintiff Epic in this district and because Defendant maintains its principal place of business in this district, a substantial part of the events or omissions giving rise to the claims occurred in this district, and Defendant purposefully directed activities to this district.

8.    An actual controversy exists between Defendant and Plaintiff as to whether the Asserted Patents are invalid. For example, in its Counterclaims, Acceleration Bay asserts that Epic infringes valid claims of the Asserted Patents.

9.    Epic denies that any claims of the Asserted Patents are valid or that any of its activities infringe any claim of the Asserted Patents purportedly owned by Defendant.

10.    There is an immediate, real, and substantial justiciable controversy between Plaintiff and Defendant as to whether the claims of the Asserted Patents are invalid. This controversy is of such immediacy and reality as to warrant declaratory relief so that the parties may ascertain their rights and duties with respect to the Asserted Patents. Therefore, without waiver of any rights,

including the right to challenge prudential standing, Plaintiff brings this declaratory judgment action seeking a declaration that it and the Accused Products do not infringe any of the Asserted Patents.

## FACTUAL ALLEGATIONS

11.    The effective filing date for all of the Asserted Patents is July 31, 2000, and thus the "critical date" for prior art under pre-AIA 35 U.S.C. § 102(b) is July 31, 1999.

12.    DirectPlay (DirectX version 5.2) was in public use, on sale, and known by others in the United States before July 31, 1999, and is thus prior art to the Asserted Patents. The features and functionality of DirectPlay were described in multiple documents including Bradly Bargen & Peter Donnelly, *Inside DirectX* ("Inside DirectX"), published in 1998.

13.    Dan Kegel authored a paper titled "NAT and Peer-to-Peer Networking" that was published at http://alumnus.caltech.edu/~dank/peer-nat.html no later than July 17, 1999, and was thus a prior art printed publication to the Asserted Patents.

14.    Katia Obraczka authored a Ph.D. thesis titled, "Massively Replicating Services In Wide Area Internetworks" that was published in 1994 and was thus a prior art printed publication to the Asserted Patents.

15.    Jose Rufino *et al* authored a paper titled "A Study on the Inaccessibility Characteristics of ISO 8802/4 Token Bus LANs" in the IEEE INFOCOM '92: The conference on Computer Communications; Eleventh Annual Joint Conference of the IEEE Computer and Communications Societies publication that was published in 1992 and was thus a prior art printed publication to the Asserted Patents.

16.    Shoubridge and Dadej authored a paper titled "Hybrid Routing in Dynamic Networks" in the IEEE International Conference on Communications, Montreal 1997 publication that was published in 1997 and was thus a prior art printed publication to the Asserted Patents.

17.    Alagar *et al* authored a paper titled "Reliable Broadcast in Mobile Wireless networks" in the Military Communications Conference, 1 IEEE MILCOM '96 Conf. Rec. publication that was published in 1995 and was thus a prior art printed publication to the Asserted Patents.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# FIRST CAUSE OF ACTION

(Declaratory judgement of Invalidity of the '344 Patent)

18.     Claim 21 of the '344 patent is invalid.

19.     As one example of the invalidity of claim 21 of the '344 patent, all of the elements of the claim were taught in the prior art and it would have at least been obvious to a person of ordinary skill in the art to combine those teachings to practice the claimed invention.

20.     The prior art taught "a computer network for providing a game environment for a plurality of gaming participants, each gaming participant having connections to at least three neighbor gaming participants." For example, Alagar taught mobile hosts with computational capabilities that form wireless networks where each host is connected to more than three neighbors. Alagar at pp. 237–238. DirectPlay taught a computer network that provided a game environment. *Inside DirectX*, pp. 283, 284, 286–287, 336, 360, 387.

21.     The prior art taught "an originating gaming participant send[ing] gaming data to the other gaming participants by sending the gaming data through each of its connections to its neighbor gaming participants" and "each gaming participant send[ing] gaming data that it receives from a neighbor gaming participant to its other neighbor gaming participants." For example, Alagar taught broadcasting messages to all of the hosts in the network by transmitting the message to all of its neighbors and upon receiving such a broadcast message, each host retransmits the message to all of its neighbors. Alagar at pp. 238–239.

22.     The prior art taught "the network is m-regular, where m is the exact number of neighbor gaming participants of each gaming participant." For example, Alagar taught that the optimum network was where each host is connected to an average of six neighbors. Alagar, p. 237. A person of ordinary skill would understand that one way for each host to have an average of six connections is for each host to have exactly six connections, making the network m-regular.

23.     The prior art taught "the number of gaming participants is at least two greater than m thus resulting in a non-complete graph." For example, Alagar taught that transient and permanent disconnection of its links and detecting and connecting to new neighbors. Alagar at pp. 237–238. A person of skill in the art would have understood these disclosures to mean that Alagar taught

networks where the number of participants is at least two greater than m and the network was still incomplete.

24.    The prior art taught "the connections between the gaming participants are peer-to-peer connections." For example, Alagar taught that hosts form direct peer-to-peer connections. Alagar, p. 238.

25.    The prior art taught, "the network is formed through a broadcast channel that overlays an underlying network." For example, Alagar disclosed broadcasting data on a channel that was overlaid on a network formed of wireless connections between hosts. Alagar, pp. 237–239.

26.    The prior art taught, "the game environment is provided by at least one game application program executing on each computer of the computer network that interacts with the broadcast channel." For example, Direct Play taught that the game environment was provided by application programs executing on each computer of the network. Inside DirectX, pp. 285–286.

27.    The prior art taught, "gaming participants can join and leave the network using the broadcast channel." For example, Alagar taught that hosts can leave and join the network. Alagar, pp. 237–238.

28.    A person of ordinary skill in the art would have been motivated to combine these teachings of Alagar and Direct Play. For example, a person of ordinary skill in the art would have been motivated to apply DirectPlay's teachings of a particular type of user traffic on a game of interest (i.e., game information related to a game of interest) when implementing a network taught by Alagar, such that the networked session of game participants forms a broadcast channel for the game. The application of these teachings would advantageously allow the participants in Alagar's flooding technique to further participate in the game.

29.    As another example of the invalidity of claim 21 of the '344 patent, upon information and belief, Acceleration Bay asserts that claim 21 of the '344 patent is met by software alone. That assertion makes claim 21 invalid for covering non-statutory subject matter.

30.    Claim 21 of the '344 patent is directed to the patent ineligible abstract idea of broadcasting information.

31.    Broadcasting information is a traditional human activity and can refer to a "one to

many" method of sending identical information from one source to many recipients.  Early examples of broadcasting include distribution of identical information by printed materials and telegraph. Later examples include radio and television transmissions of an individual station to multiple listeners and viewers.

32.    In the patents, general purpose computers connected to the internet are used to form a broadcast channel. The computers use existing internet technology to send information among the computers. See, e.g., '344 Pat., 4:14–22. In other words, the network formed by these general purpose computers relies on, or "overlays," the internet. None of this is novel.

33.    The main purported point of novelty for these three patents is that the claimed broadcast channels/networks must form a specific type of topology. The "topology" of a computer network refers to the layout of a computer network—which computers are connected to each other, and which are not.  The claimed broadcast channels/networks must form what is known in mathematics as an "m-regular" and incomplete graph, where "m" is at least three.  But, this too, is not novel. As the PTAB confirmed, it was known in the art to use this very topology to broadcast information.

34.    As another example of the invalidity of claim 21, the claim is invalid for indefiniteness, including as to the terms "participant" and "broadcast channel."

## SECOND CAUSE OF ACTION

(Declaratory judgement of Invalidity of the '966 Patent)

35.    Claim 19 of the '966 patent is invalid.

36.    As one example of the invalidity of claim 19 of the '966 patent, all of the elements of the claim were taught in the prior art and it would have at least been obvious to a person of ordinary skill in the art to combine those teachings to practice the claimed invention.

37.    The prior art taught, "a computer network for providing an information delivery service for a plurality of participants, each participant having connections to at least three neighbor participants." For example, Alagar taught mobile hosts with computational capabilities that form wireless network information delivery services where each host is connected to more than three neighbors. Alagar, pp. 237–238.

38.     The prior art taught, "an originating participant send[ing] data to the other participants by sending the data through each of its connections to its neighbor participants" and "each participant send[ing] data that it receives from a neighbor participant to its other neighbor participants." For example, Alagar taught broadcasting messages to all of the hosts in the network by transmitting the message to all of its neighbors and upon receiving such a broadcast message, each host retransmits the message to all of its neighbors. Alagar, pp. 238–239.

39.     The prior art taught, "the network is m-regular, where m is the exact number of neighbor participants of each participant." For example, Alagar taught that the optimum network was where each host is connected to an average of six neighbors. Alagar, p. 237. A person of ordinary skill would understand that one way for each host to have an average of six connections is for each host to have exactly six connections, making the network m-regular.

40.     The prior art taught, "the number of participants is at least two greater than m thus resulting in a non-complete graph." For example, Alagar taught that transient and permanent disconnection of its links and detecting and connecting to new neighbors. Alagar, pp. 237–238. A person of skill in the art would have understood these disclosures to mean that Alagar taught networks where the number of participants is at least two greater than m and the network was still incomplete.

41.     The prior art taught, "the connections are peer-to-peer connections." For example, Alagar taught that hosts form direct peer-to-peer connections. Alagar, p. 238.

42.     The prior art taught, "the network is formed through a broadcast channel that overlays an underlying network." For example, Alagar disclosed broadcasting data on a channel that was overlaid on a network formed of wireless connections between hosts. Alagar, pp. 237–239.

43.     The prior art taught, "the information delivery service is provided by at least one information delivery service application program executing on each computer of the computer network that interacts with the broadcast channel." For example, Direct Play taught that its game information delivery service was provided by application programs executing on each computer of the network. Inside DirectX, pp. 285–286.

44.     The prior art taught, "participants can join and leave the network using the broadcast

channel." For example, Alagar taught that hosts can leave and join the network. Alagar, pp. 237–238.

45.     A person of ordinary skill in the art would have had reasons to combine these teachings of Alagar and Direct Play. For example, a person of ordinary skill in the art would have been motivated to apply DirectPlay's teachings of a particular type of user traffic on a game of interest (i.e., game information related to a game of interest) when implementing a network taught by Alagar, such that the networked session of game participants forms a broadcast channel for the game. The application of these teachings would advantageously allow the participants in Alagar's flooding technique to further participate in the game.

46.     As another example of the invalidity of claim 19 of the '966 patent, upon information and belief, Acceleration Bay asserts that claim 19 of the '966 patent is met by software alone. That assertion makes claim 19 invalid for covering non-statutory subject matter.

47.     Claim 19 of the '966 patent is directed to the patent ineligible abstract idea of broadcasting information.

48.     Broadcasting information is a traditional human activity and can refer to a "one to many" method of sending identical information from one source to many recipients.  Early examples of broadcasting include distribution of identical information by printed materials and telegraph.  Later examples include radio and television transmissions of an individual station to multiple listeners and viewers.

49.     In the patents, general purpose computers connected to the internet are used to form a broadcast channel. The computers use existing internet technology to send information among the computers. *See, e.g.*, '344 Pat., 4:14–22. In other words, the network formed by these general purpose computers relies on, or "overlays," the internet. None of this is novel.

50.     The main purported point of novelty for these three patents is that the claimed broadcast channels/networks must form a specific type of topology. The "topology" of a computer network refers to the layout of a computer network—which computers are connected to each other, and which are not.  The claimed broadcast channels/networks must form what is known in mathematics as an "m-regular" and incomplete graph, where "m" is at least three.  But, this too, is

1    not novel. As the PTAB confirmed, it was known in the art to use this very topology to broadcast
2    information.

3           51.    As another example of the invalidity of claim 19, the claim is invalid for
4    indefiniteness, including as to the terms "participant" and "broadcast channel."

5                                    **THIRD CAUSE OF ACTION**

6                          (Declaratory judgement of Invalidity of the '634 Patent)

7           52.    Claim 25 of the '634 patent is invalid.

8           53.    As one example of the invalidity of claim 25, all of the elements of the claim were
9    taught in the prior art and it would have at least been obvious to a person of ordinary skill in the art
10   to combine those teachings to practice the claimed invention.

11          54.    The prior art taught, "a non-routing table based computer network having a plurality
12   of participants, each    participant being an application program, and each participant having
13   connections to at least three neighbor participants." For example, Alagar taught mobile hosts with
14   computational capabilities that form wireless networks where each host is connected to more than
15   three neighbors. Alagar at pp. 237–238. And Direct Play taught that the game environment was
16   provided by application programs executing on each computer of the network. Inside DirectX, pp.
17   285–286. To the extent Alagar was a routing-table network, it would have been obvious to a person
18   of ordinary skill in the art to implement Alagar without routing tables.

19          55.    The prior art taught "an originating participant send[ing] data to the other participants
20   by sending the data through each of its connections to its neighbor participants" and "each
21   participant send[ing] data that it receives from a neighbor participant to its other neighbor
22   participants." For example, Alagar taught broadcasting messages to all of the hosts in the network
23   by transmitting the message to all of its neighbors and upon receiving such a broadcast message,
24   each host retransmits the message to all of its neighbors. Alagar, pp. 238–239.

25          56.    The prior art taught, "data is numbered sequentially so that data received out of order
26   can be queued and rearranged." For example, this has long been a component of connectionless
27   networking protocols and was well known to those of ordinary skill in the art.

28          57.    The prior art taught, "the network is m-regular and m-connected, where m is the

                                                    15

number of neighbor participants of each participant." For example, Alagar taught that the optimum network was where each host is connected to an average of six neighbors. Alagar, p. 237. A person of ordinary skill would understand that one way for each host to have an average of six connections is for each host to have exactly six connections, making the network m-regular.

58.   The prior art taught, "the number of participants is at least two greater than m thus resulting in a non-complete graph." For example, Alagar taught that transient and permanent disconnection of its links and detecting and connecting to new neighbors. Alagar, pp. 237–238. A person of skill in the art would have understood these disclosures to mean that Alagar taught networks where the number of participants is at least two greater than m and the network was still incomplete.

59.   The prior art taught "the connections are peer-to-peer connections, further wherein the network is an overlay network that overlays an underlying network." For example, Alagar taught that hosts form direct peer-to-peer connections. Alagar, p. 238.

60.   The prior art taught "each participant can interact with a broadcast channel with a channel type and a channel instance." Broadcast channels with types and instances were well known to those of ordinary skill in the art.

61.   The prior art taught, "the network is dynamic and participants can join and leave the network using the broadcast channel." For example, Alagar taught that hosts can leave and join the network. Alagar, pp. 237–238.

62.   A person of ordinary skill in the art would have had reasons to combine these teachings of Alagar and Direct Play. For example, a person of ordinary skill in the art would have been motivated to apply DirectPlay's teachings of a particular type of user traffic on a game of interest (i.e., game information related to a game of interest) when implementing a network taught by Alagar, such that the networked session of game participants forms a broadcast channel for the game. The application of these teachings would advantageously allow the participants in Alagar's flooding technique to further participate in the game.

63.   As another example of the invalidity of claim 25 of the '634 patent, upon information and belief, Acceleration Bay asserts that claim 25 of the '634 patent is met by software alone. That

assertion makes claim 25 invalid for covering non-statutory subject matter.

64.     Claim 25 of the '634 patent is directed to the patent ineligible abstract idea of broadcasting information.

65.     Broadcasting information is a traditional human activity and can refer to a "one to many" method of sending identical information from one source to many recipients.  Early examples of broadcasting include distribution of identical information by printed materials and telegraph.  Later examples include radio and television transmissions of an individual station to multiple listeners and viewers.

66.     In the patents, general purpose computers connected to the internet are used to form a broadcast channel. The computers use existing internet technology to send information among the computers. *See, e.g.*, '344 Pat., 4:14–22. In other words, the network formed by these general purpose computers relies on, or "overlays," the internet. None of this is novel.

67.     The main purported point of novelty for these three patents is that the claimed broadcast channels/networks must form a specific type of topology. The "topology" of a computer network refers to the layout of a computer network—which computers are connected to each other, and which are not.  The claimed broadcast channels/networks must form what is known in mathematics as an "m-regular" and incomplete graph, where "m" is at least three.  But, this too, is not novel. As the PTAB confirmed, it was known in the art to use this very topology to broadcast information.

68.     As another example of the invalidity of claim 25, the claim is invalid for indefiniteness, including as to the terms "non-routing table based," "participant," and "broadcast channel."

## FOURTH CAUSE OF ACTION

(Declaratory judgement of Invalidity of the '069 Patent)

69.     Claims 14-17 of the '069 patent are invalid.

70.     As one example of the invalidity of claims 14-17 of the '069 patent, all of the elements of claim 14 were taught in the prior art and it would have at least been obvious to a person of ordinary skill in the art to modify teachings of the prior art to practice the claimed invention.

71.     The prior art taught, "a computer-based, non-switch based method for adding nodes to a graph that is m-regular and m-connected to maintain the graph as m-regular, where m is four or greater." For example, the Obraczka Thesis taught a computer-based method for adding a node to a graph, each node being connected to two, three, and more other nodes. Obraczka Thesis, pp. 48, 60–61.

72.     The prior art taught, "identifying p pairs of nodes of the graph that are connected, where p is one half of m." For example, the Obraczka Thesis taught the incorporation of new nodes in a network configured to maintain a k-regular, k-connected topology which randomly selected four nodes connected pairwise. Obraczka Thesis, pp. 36, 38, 12, 112. The prior art also taught identifying the p pair of nodes "wherein a seeking node contacts a fully connected portal node." For example, the Obraczka Thesis taught that one of the nodes is arbitrarily designated as the group master and is responsible for computing logical update topologies for the group. Obraczka Thesis, pp. 20, 91. A person of ordinary skill in the art would have understood that the group master is "fully connected" because it is a part of the preexisting k-connected group. Obraczka Thesis, pp. 20, 37. And the prior art also taught that the fully connected portal computer "sends an edge connection request to a number of randomly selected neighboring nodes to which the seeking node is to connect." For example, Obraczka taught that the group master figures out through random calculations who those candidate neighbors will be and then sends a message (topology update message) to those randomly selected computers. Obraczka Thesis, pp. 20, 40. After receiving the message, each of those computers would eventually follow the instructions applicable to it respectively and commit to the new topology that incorporates the seeking participant, but only after it floods the topology update to neighbors under the old topology. Obraczka Thesis, p. 20.

73.     The prior art taught, "disconnecting the nodes of each identified pair from each other." For example, the Obraczka Thesis taught disconnecting participants in order to connect a new participant to a network of participants. Obraczka Thesis, p. 43.

74.     The prior art taught, "connecting each node of the identified pairs of nodes to the seeking node." For example, the Obraczka Thesis taught connecting participants to a network of participants. Obraczka Thesis, p. 43.

75.     As another example of the invalidity of claims 14-17 of the '069 patent, the claims are directed to the patent ineligible idea of adding nodes to a graph.

76.     As another example of the invalidity of claims 14-17 of the '069 patent, the claims are also invalid for indefiniteness, including as to the terms "node" and "non-switch based."

### FIFTH CAUSE OF ACTION

(Declaratory judgement of Invalidity of the '147 Patent)

77.     Claims 6-10 of the '147 patent are invalid.

78.     As one example of the invalidity of claims 6-10 of the '147 patent, all of the elements of claim 6 were taught in the prior art and it would have at least been obvious to a person of ordinary skill in the art to combine those teachings to practice the claimed invention.

79.     The prior art taught, "a method for healing a disconnection of a first computer from a second computer, the computers being connected to a broadcast channel, said broadcast channel being an m-regular graph where m is at least 3." For example, Shoubridge discloses a sixty-four computer network where each computer is connected to four neighbors. Shoubridge, pp. 1381–84. As another example, Rufino discloses a broadcast medium for data transmission using a token ring protocol. Rufino, p. 0959. Rufino also discloses a method of maintaining the broadcast channel when a computer leaves the channel. Rufino, P. 0960.

80.     The prior art taught, "attempting to send a message from the first computer to the second computer." For example, Shoubridge taught that computers could be mobile, which would result in loss of connections in the network. Shoubridge, p. 1381. A person of ordinary skill in the would have understood that when a mobile computer caused a loss of connection in the Shoubridge network, that change could have been detected by attempting to send a message from the first computer to the second computer.

81.     The prior art taught, "when the attempt to send the message is unsuccessful, broadcasting from the first computer a connection port search message indicating that the first computer needs a connection." For example, Rufino taught broadcasting messages that searches for a connection port on the broadcast channel to maintain the network graph. Rufino, p. 0960. A person of ordinary skill in the art would have been motivated to modify Shoubridge so that it would

19

broadcast the message as disclosed in Rufino in order to maintain the network graph when a mobile computer caused there to be a lost connection in the network.

82. The prior art taught, "having a third computer not already connected to said first computer respond to said connection port search message in a manner as to maintain an m-regular graph." For example, a person of ordinary skill in the art would have understood that when a third computer received the message disclosed in Rufino, the third computer would form a connection to the first computer in order to maintain the network graph.

83. A person of ordinary skill in the art would have been motivated to combine Shoubridge and Rufino because Shoubridge taught that its system is used in a reliable dynamic network where m is four (according to one example), and Rufino addresses how to maintain an m-regular non-complete topology when removing a node for an m-regular network.

84. As another example of the invalidity of claims 6–10 of the '147 patent, the claims are directed to the patent ineligible idea of removing a computer from a network.

85. As another example of the invalidity of claims 6–10 of the '147 patent, the claims are also invalid for indefiniteness, including as to the terms "first computer," "second computer," "third computer" and "broadcast channel."

## SIXTH CAUSE OF ACTION

(Declaratory judgement of Invalidity of the '497 Patent)

86. Claims 2 and 6 of the '497 patent are invalid.

87. As one example of the invalidity of claims 2 and 6 of the '497 patent, all of the elements of claim 2, were taught in the prior art or it would have at least been obvious to a person of ordinary skill in the art to modify the teachings of the prior art in order to practice the claimed invention.

88. The prior art taught, "a method in a computer for locating a computer through which to connect to a network." For example, Kegel discloses a method for solving issues with communicating via peer-to-peer networking through NATs that a POSITA would have understood was implemented in software. The software-based functionality described by Kegel was used to locate a computer through which to connect to a network since Kegel describes a peer-to-peer

connection that is connected to a network running the Heavy Gear 2 game environment.

89.     The prior art taught, "providing an identification of a portal computer or a plurality of portal computers, the portal computer or the plurality of portal computers having a communications port or communications ports with a call-in port being enabled for communications when the portal computer or the plurality of portal computers is in a state to coordinate the connection of a seeking computer to the network, wherein the call-in port is a type of communications port." For example, Kegel taught a "peer-to-peer" network where a "new peer" sends a UDP packet to one or more "old peers" via a single UDP port. Kegel, pp. 1–2. In the process described by Kegel, each peer is identified to each other peer by an address server that provides two address-port pairs to each peer. Kegel, p. 2. Based on these disclosures, a person of ordinary skill in the art would have understood that the new peer contacts the communication port of the old peer (the single UDP port), and thus the new peer can be connected to the peer-to-peer network for communicating with other computers.

90.     The prior art taught, "selecting the communications port or communications ports of the portal computer or the plurality of portal computers and attempting to communicate with the selected communications port or communications ports until communications with the call-in port is successful, wherein a port ordering algorithm is used to identify the call-in port, and wherein the communications ports selected by the port ordering algorithm may be re-ordered." For example, Kegel taught attempting to contact the identified portal computer (i.e., one of the identified peers). Kegel, pp. 1–2. Kegel also taught a way of selecting the communication port of a particular peer in a peer-to-peer network by (1) contacting an address server and providing that address server with the address that a particular peer believes it has (IP address and UDP port number), (2) having the address server provide both the IP address and port number from the packet header received from the peer, as well as the peer's understanding of its IP address and port number to all other peers, (3) having each peer send a message to both the public and private addresses for each peer, and (4) awaiting a response from each peer, at which time the peer sending the messages to each peer will be able to identify which is the correct address/port number combination for each peer in the peer-to-peer network. Kegel, p.2. Although Kegel did not expressly mention the use of "a port ordering algorithm," a person of ordinary skill in the art would have understood that Kegel's peers would be

running an algorithm that identifies one of the port/address combinations to send the packet to first since packets are not sent at the exact same time. At the very least, given the finite number of ways a person of ordinary skill in the art could implement port selection, all of which having a reasonable expectation of success, it would have been obvious to try. Based on Kegel's disclosure that the address server sends both addresses to the other peers, and that the new peer sends a UDP packet to each of the old peers, Kegel, p.2, a person of ordinary skill in the art would have found it obvious to select the call-in port of the identified portal computer using an algorithm that, for example, populated the variables in an array of IP address/port combinations in a particular manner, such that the variables are populated in a sequential order. Although Kegel does not disclose re-ordering the communications ports selected by the port-ordering algorithm, it would have been obvious to a person of ordinary skill in the art to implement Kegel's algorithm by re-ordering the ports selected by the algorithm because it would have made the algorithm more efficient.

91.    The prior art taught, "using the call-in port to request that the portal computer or the plurality of portal computers coordinate the connecting of the seeking computer to the network." For example, Kegel taught using the call-in port to bring a "new peer" into the network. Kegel, pp. 1–2.

92.    The prior art taught, "the portal computer or the plurality of portal computers selects a call-in port, and further wherein the communications ports are selected in an order that is the same as used by the portal computer when it selected a call-in port." For example, one of ordinary skill in the art that the portal computer could select the call-in port and that the communication ports could be selected in the same order as the call-in port. At the very least, given the finite number of ways a person of ordinary skill in the art could implement port selection, all of which having a reasonable expectation of success, it would have been obvious to try.

93.    As another example of the invalidity of claims 2 and 6 of the '497 patent, the claims are also invalid as indefinite, including as to the term "portal computer" and "seeking computer."

## PRAYER FOR RELIEF ON EPIC'S COUNTERCLAIMS

WHEREFORE, Plaintiff Epic respectfully prays for relief against Defendant as follows:

1.    For a declaratory judgment that claim 21 of the '344 patent, claim 19 of the '966

patent, claim 25 of the '634 patent, claim 14–17 of the '069 patents, claim 6-10 of the '147 patent, and claims 2 and 6 of the '497 patent are invalid under Title 35 of the United States Code for failing to satisfy the requirements of, without limitation, 35 U.S.C. §§ 101, 102, 103, and/or 112;

2.      Enjoining Defendant, its officers, agents, servants, employees, and all persons acting in concert or participation with Defendant from initiating infringement litigation against, and from threatening, Plaintiff or purchasers or users of Plaintiff's products or services with infringement litigation or charging any of them verbally or in writing with infringement of the Asserted Patents, or representing to any of them that infringement has occurred, because of any activities of Plaintiff;

3.      Determining that this is an exceptional case under 35 U.S.C. § 285;

4.      For Plaintiff's costs and reasonable attorneys' fees incurred herein; and

5.      For such other and further relief as the Court may deem appropriate.

Dated:  November 26, 2019                      WINSTON & STRAWN LLP

                                               By   /s/ Michael A. Tomasulo
                                                    David P. Enzminger
                                                    Michael A. Tomasulo
                                                    Louis L. Campbell
                                                    Matthew R. McCullough
                                                    Saranya Raghavan (*pro hac vice*)

                                                    Attorneys for Plaintiff and Counter-Defendant
                                                    EPIC GAMES, INC.